Filed 4/16/15  Monet v. Bank of America CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| CHRIS MONET, Individually and as Trustee, etc.,<br><br>  Plaintiff and Appellant,<br><br>v.<br><br>BANK OF AMERICA, N.A., et al.,<br><br>  Defendants and Respondents. | H039832<br>(Santa Cruz County<br> Super. Ct. No. CV 171477) |

Plaintiff Christopher Monet, individually and as trustee of the L & M Family Living Trust (hereafter jointly Monet), obtained a loan for $868,000 secured by a deed of trust on real property.  Monet defaulted on his loan.  After the property was sold at a foreclosure sale, Monet sued the mortgage lender, trustee, and other entities to set aside the foreclosure sale.  The operative complaint contained seven causes of action that survived demurrer.  These included causes of action:  (1) to set aside the foreclosure sale, (2) for wrongful foreclosure, (3) to void or cancel the trustee's deed upon sale, (4) to quiet title, (5) for negligence, (6) for unfair business practices, and (7) for injunctive relief.

Monet appeals from the trial court's grant of summary judgment.  We conclude that defendants met their initial burden on summary judgment on all causes of action, which shifted the burden to Monet to present admissible evidence that created a triable

issue of material fact regarding any of his causes of action.  Since Monet has failed to do so, we will affirm the trial court's grant of summary judgment.

FACTS

This litigation concerns a loan on a single-family residence located at 25111 Soquel San José Road, Los Gatos, Santa Cruz County (the Property).  Christopher Monet and his wife, Kathee Lyda, acquired the Property in 1996.  In 2000, Lyda and Monet transferred title to the property to the L & M Family Living Trust.

Monet and Lyda refinanced the Property in January 2005 with a total loan package of $856,000.  In June 2006, Monet and Lyda once again refinanced the Property with Countrywide Home Loans (Countrywide) and obtained the loan that is the subject of this litigation.  As part of the June 2006 transaction, Monet and Lyda executed an interest-only adjustable rate promissory note (Note) for $868,000.  The Note provided that the loan would be repaid over 30 years.  To avoid default during the first five years, the borrowers were required to make interest-only payments at a fixed rate of interest of 6.125 percent, which amounted to monthly payments of $4,430.42.  After five years, the loan would begin to fully amortize and the interest rate would become an adjustable rate based on the LIBOR (the London Interbank Offered Rate) plus 2.25 percent.  The Note identified the "Lender" as Countrywide and provided that "Lender may transfer this note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the 'Noteholder.' "

The loan was secured by a deed of trust (Deed of Trust) on the Property.  The Deed of Trust identifies the borrowers as "Chris Monet, and Kathee Lyda, trustee in trust under the[] L & M Family Living Trust."  (Only Monet has sued, both individually and in his capacity as a trustee of the trust.  Hereafter, we shall refer to the borrowers simply as "Monet.")  The Deed of Trust identifies Countrywide as the "Lender," Recontrust

2

Company, N.A. (Recontrust) as the "Trustee," and Mortgage Electronic Registration Systems, Inc. (MERS) as "acting solely as nominee for Lender and Lender's successors and assigns" and as the "beneficiary" under the Deed of Trust. The Deed of Trust provides: "The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. . . . Borrower irrevocably grants and conveys to Trustee, in trust, with the power of sale," the Property. The Deed of Trust also states: "Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right to exercise any of those interests, including, but not limited to, the right to foreclose and sell the Property . . . ." With respect to the Note, the Deed of Trust also provides: "The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the" loan servicer.

In August 2006, Monet received a letter from Countrywide advising him that "the creditor to whom the debt is owed" was Redwood Trust Holdings, Inc. and that Countrywide was servicing the loan.

In April 2009, almost three years after Monet took out the loan, he stopped making payments. In June 2009, Monet sent a letter to Countrywide asking it to produce the Note for his inspection. Citing the Real Estate Settlement Procedures Act of 1974 (RESPA, 12 U.S.C. § 2601, et. seq.), Monet stated: "Countrywide is required to acknowledge my written request within 20 business days and must try to resolve the issue within 60 business days." In August 2009, Monet sent another letter to Countrywide, stating that (1) he was concerned about the accounting and servicing of his mortgage and (2) he believed he might be the victim of predatory lending practices. Monet asked Countrywide to audit his "account since its inception," to provide him with 21 categories

of documents, and to consider his letter a "qualified written request" (QWR) under RESPA and the Truth in Lending Act (TILA), 15 U.S.C. 1601, et seq.

On September 9, 2009, Monet received a written response from the customer service department at Bank of America Home Loans (Bank of America), which had taken over the servicing of his loan. Bank of America's letter stated that Monet's request went "well beyond that which is available through a [QWR]" and stated that a QWR cannot be used to "support a phishing [*sic*] expedition for documents that may support a claim or as a pretext designed to force the lender to accept a modification request rather than incur the expense of responding." Although Bank of America believed Monet's requests were "overly broad, unduly burdensome, and not in conformity with" the RESPA, it agreed to provide information that was consistent with the requirements of the RESPA, including "available documents" relating to the origination of his loan and a statement outlining the transactions associated with the loan. Bank of America advised Monet that the "owner of this loan is Wells Fargo" and referred him to MERS for information about assignments related to the loan. Bank of America also listed documents it would need to review in the event Monet wanted to pursue "payment assistance" and gave him contact information for its "Home Retention Division."

On October 16, 2009, Monet sent a letter to Countrywide stating: "If you are not the current 'Holder in Due Course' (investor), please send me that information within 10 days."

On December 23, 2009, Monet sent Bank of America a request for validation of debt pursuant to the Fair Debt Collection Practices Act (15 U.S.C. § 1501, et seq.). On January 5, 2010, Bank of America responded that Monet's request was " 'not related to a servicing concern.' " On February 24, 2010, Monet sent Bank of America a "Notice of Default," which (1) asserted that since Bank of America had failed to respond to his request, it was "stopped [*sic*] from maintaining the original collection action" (15 U.S.C.

4

§ 1692g(b)); (2) alleged that Bank of America had agreed the debt was invalid; and (3) gave Bank of America 10 days to "cure" its default. On March 22, 2010, Monet sent another notice to Bank of America (1) stating that since it had not responded to his previous notices, it could not continue to collect amounts due under the loan, and (2) claiming a superior right to the Property.

The first amended complaint alleged that on March 31, 2010, Monet sent an unnamed entity a "Notice of Recession [*sic*] of Contract," on the ground that he "was never provided with TILA Disclosures, or Right to Cancel documents." Monet alleged that the notice stated he "was willing and able to tender all sums due to the 'lender' " and that he never received a response.

On June 7, 2010, Recontrust—the original Trustee—recorded a notice of default and election to sell under the Deed of Trust (Notice of Default). The Notice of Default stated that Monet had failed to make the April 2009 payment and all subsequent payments, and owed $73,047.83 on the loan as of June 4, 2010. Attached to the Notice of Default was a declaration from Lorraine Young of Bank of America, signed under penalty of perjury, which stated that the loan servicer had "tried with due diligence to contact the borrower in accordance with California Civil Code Section 2923.5" to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure. The first amended complaint, however, alleged that Monet "never received any communications as prescribed by" section 2923.5.

On June 18, 2010, Recontrust recorded a "Corporation Assignment of Deed of Trust" (sometimes "the Assignment") dated June 4, 2010, in which MERS assigned "all beneficial interest" under the Deed of Trust, "together with the note or notes therein described," to "HSBC Bank USA, National Association as trustee for the holders of Sequoia 2006-1" (HSBC). (All caps and bold omitted.) The Assignment was signed by

"T. Sevillano, Assistant Secretary" for MERS. Sevillano's signature was notarized by Ahmad Afzal in Ventura County, California.

On July 14, 2010, Monet sent a letter to Recontrust in which he stated that he was "not aware of any debt [he] may have" that was being serviced by Bank of America and demanded that the matter be closed within 30 days.

On September 13, 2010, Recontrust recorded a notice of trustee's sale (Notice of Sale), which stated that a trustee's sale had been scheduled for October 6, 2010. Recontrust eventually sold the Property to HSBC on February 22, 2011, at a trustee's sale. On March 3, 2011, Recontrust recorded a trustee's deed upon sale (Trustee's Deed), which stated that the total amount of the unpaid debt at the time of the sale was $990,140.54 and that HSBC had paid $787,500 for the property.

## PROCEDURAL HISTORY

### Original and First Amended Complaints

Monet filed his original complaint in June 2011. The named defendants (Bank of America, N.A.; BAC Home Loans Servicing; HSBC; and Recontrust) demurred to the original complaint. Monet did not file opposition to the demurrer. At the hearing on the demurrer, counsel for defendants advised the court that Monet planned to file a first amended complaint. The court ruled that the demurrer would be deemed withdrawn.

Monet filed his first amended complaint in December 2011. The first amended complaint was verified. The named defendants were Bank of America, HSBC, Recontrust, and MERS (hereafter jointly "Defendants"). The first amended complaint contained causes of action: (1) for temporary and permanent injunctive relief, (2) for negligence, (3) to set aside the trustee's sale, (4) for wrongful foreclosure, (5) for fraud, (6) for violation of the unfair competition law (Bus. & Prof. Code, § 17200, et seq.), (7) for an accounting, (8) to void or cancel the Trustee's Deed, and (9) to quiet title.

6

Attached to the first amended complaint were 17 exhibits that Monet incorporated by reference.

Monet alleged that after he obtained the subject loan from Countrywide, his loan was pooled with other loans and transferred to a securitized trust—the Sequoia 2006-1 Trust. He also alleged that: (1) the securitization process required that both the Note and the Deed of Trust be transferred into the securitized trust on or before its closing date (August 20, 2006), and (2) his Note and Deed of Trust were not transferred into the securitized trust in time, and were therefore not part of the trust. He asserted that HSBC was a "third-party stranger" to the loan and had no right to collect his mortgage payments or foreclose on the Property. And he alleged, on information and belief, that the securitized trust was dismantled after HSBC received "[m]ortgage insurance payouts." He further alleged that Recontrust—the original trustee—was not named in the pooling and service agreement (PSA) for the securitized trust and, therefore, Recontrust ceased to have any authority to act after the loan was securitized.

Monet also alleged that Sevillano (who signed the Assignment on behalf of MERS) was actually an employee of Recontrust and a known "robo-signer," and that the Assignment was "fraudulently executed without any Defendants' authorization." He alleged that the signature of the notary on the Assignment (Afzal) was forged. He asserted that the Assignment, which was executed in June 2010, was a legal nullity because the securitized trust closed in August 2006 and because the PSA prohibited the assignment of any loans that were already in default. He also asserted that none of the Defendants were the present holders of the Note. He alleged that as a result of Defendants' actions: (1) he overpaid interest; (2) his credit had been damaged; (3) title to his home had been slandered and rendered unmarketable; (4) he did not know who the actual noteholder was and, therefore, he was subject to "double financial jeopardy"; and (5) he suffered pecuniary losses, including attorney fees.

7

*Demurrer to First Amended Complaint*

In January 2012, Defendants demurred to the first amended complaint. Monet opposed the demurrer. The trial court (1) sustained the demurrers without leave to amend to the fifth cause of action for fraud and the seventh cause of action for an accounting; (2) overruled the demurrers to the other causes of action, and (3) ordered Defendants to answer. In this appeal, Monet does not challenge the trial court's ruling on demurrer regarding the fraud and accounting causes of action.

*Application for a Temporary Restraining Order and Preliminary Injunction*

On April 11, 2012, Monet filed an ex parte application for a temporary restraining order to prevent Defendants from "selling" the Property, evicting Monet, or proceeding with a related unlawful detainer action (Santa Cruz County Superior Court Case No. CV171703) that was set for trial on April 16, 2012. At that time, Monet told the court he and his family still lived at the Property. Monet stated he did not wish to rescind the loan; instead, he wanted "to ascertain the identity of the Lender, since it apparently [was] not [Countrywide]."

Defendants opposed the application. Defendants made a variety of legal arguments related to the merits of the case, asserted that Monet had not demonstrated a reasonable likelihood of success on the merits, and argued that the balance of the hardships tipped in Defendants' favor. They argued that the application for a preliminary injunction was " nothing more than a ploy designed to further delay [HSBC] from rightfully taking lawful possession of the Property" and that Monet had "enjoyed the benefit of rent-free possession . . . for years." They also argued that if the court grants the preliminary injunction, it should require Monet to post an undertaking and pay rent.

The court granted the preliminary injunction on the condition that Monet: (1) deposit $1,750 per month (a fair market rent) with the court starting April 25, 2012;

8

and (2) post a bond for $100,000 or deposit $50,000 in cash with the court by May 4, 2012.

***Bankruptcy; Motion to Dissolve Preliminary Injunction and Lift Bankruptcy Stay***

On June 22, 2012, Monet filed for bankruptcy, and on July 16, 2012, he filed a notice of stay of proceedings in this action based on his Chapter 13 bankruptcy filing.

In September 2012, Defendants filed a motion to dissolve the preliminary injunction on the ground that Monet had not posted a bond, made the $50,000 cash deposit, or made monthly rent payments. Defendants also asked the court to lift the bankruptcy stay, arguing that the bankruptcy action had been dismissed because Monet had not provided necessary documents to support his petition, the Property had been sold at foreclosure before Monet filed his bankruptcy petition, the automatic stay does not apply to lawsuits initiated by the debtor, and Monet failed to list the Property in his bankruptcy schedules.

Monet opposed the motion, arguing, in part, that (1) Defendants had interfered with his efforts to obtain a loan modification directly from Bank of America; (2) he was told the bankruptcy court, not state court, was "the proper party to receive his post-petition payments"; and (3) Defendants were violating stipulated judgments and government resolutions they had agreed to in other cases. Monet stated that he had filed two bankruptcy actions (one under Chapter 13 and one under Chapter 7), both of which had been dismissed, and that he had "now hired counsel and filed his bankruptcy correctly."

On November 14, 2012, the court granted Defendants' motion, dissolved the preliminary injunction, and lifted the bankruptcy stay. At the hearing, Monet said he expected to obtain another stay from the bankruptcy court in his new bankruptcy action, but he never filed a new notice of stay in this case.

9

***Motion for Summary Judgment/Summary Adjudication***

On February 13, 2013, Defendants filed a motion for summary judgment or summary adjudication (hereafter "motion for summary judgment"). Defendants argued, among other things, that (1) publicly recorded documents show that Recontrust properly foreclosed on the Property in accordance with the statutory scheme (Civ. Code, § 2924, et seq.; all further undesignated statutory references are to the Civil Code); (2) case law provides that Monet cannot challenge Defendants' right to foreclose; (3) it is immaterial who holds the Note; (4) securitization of the loan does not affect the beneficiary's standing to enforce the Deed of Trust; (5) Monet does not have standing to enforce the PSA; and (6) courts have rejected Monet's robo-signing theory. They also argued that the negligence cause of action failed because they owed no duty to Monet. Monet opposed the motion but, as we shall explain, filed very little evidence.

The trial court granted summary judgment. At the hearing on the motion, the court observed that Monet had not submitted any facts "showing any efforts by [Monet] to make payments at all or any facts supporting why it would be equitable to relieve [him] from this requirement." The court granted summary adjudication of several causes of action based on Monet's failure to tender amounts due under the loan. Monet's counsel argued that there were disputed factual issues regarding whether the foreclosure was legal, that a document was fraudulent, and that Monet was never contacted by the bank to discuss a loan modification. The court then asked "So wouldn't you have to submit a factual statement from your client stating [that he] was never contacted"? When counsel responded that Monet was relying on the documents attached to his complaint, the court correctly stated that he could not rely on his verified complaint to oppose summary judgment. (*College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 720, fn. 7 (*College Hospital*).)

DISCUSSION

## I. Deficiencies in Monet's Opening Brief

The statement of facts in Monet's opening brief contains several factual assertions that are not supported by citations to the record. Our review of the record suggests this is because these facts were never presented to the trial court.

Each and every statement in a brief concerning matters that are in the appellate record, whether factual or procedural, whether in the statement of facts, the procedural history, or the argument portion of the brief, must be supported by a citation to the appellate record. (Cal. Rules of Court, rule 8.204(a)(1)(C); all further rules citations are to the Rules of Court; *Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 745 (*Myers*); *City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239 (*Barringer*) [record citations in statement of facts do not cure failure to include record citations in argument portion of brief].) This requirement allows the reviewing court to locate relevant portions of the record expeditiously. (*Myers*, at p. 745.)

When a brief fails to refer to the record in connection with the points raised on appeal, the appellate court may treat those points as having been waived. (*Barringer*, *supra*, 102 Cal.App.4th at p. 1239; see also *Dietz v. Meisenheimer & Herron* (2009) 177 Cal.App.4th 771, 799-801 [several contentions waived because the appellant failed to provide record citations to demonstrate that he had raised those issues in the trial court].) The appellate court may also ignore unsupported contentions. (*Dominguez v. Financial Indemnity Co.* (2010) 183 Cal.App.4th 388, 392, fn. 2; *Stockinger v. Feather River Community College* (2003) 111 Cal.App.4th 1014, 1024-1025) or strike portions of the brief entirely (*Ojavan Investors, Inc. v. California Coastal Com.* (1997) 54 Cal.App.4th 373, 391).

In addition, appellate courts may not consider documents or factual matters that were not presented to the trial court or that are not part of the record on appeal. Moreover, the parties should not refer to such matters in their briefs. (*Pulver v. Avco Financial Services* (1986) 182 Cal.App.3d 622, 632 (*Pulver*); Rule 8.204(a)(2)(C).) The appellate court will disregard statements in the briefs based on such improper matter. (Rule 8.204(e); *Kendall v. Barker* (1988) 197 Cal.App.3d 619, 625; *Pulver*, at p. 632.)

Based on the aforementioned legal authorities, we will disregard factual statements in Monet's opening brief: (1) that Monet did not take a cash advance from the HELOC that was part of the subject loan package; (2) relating to an alleged offer of rescission Ken Gervais made on Monet's behalf; (3) regarding Afzal's notary book; (4) regarding notary K. Cisneroz; and (5) relating to arguments based on portions of the PSA that are not in the record. (See pages 4, 5, 8, 9, & 21 of appellant's opening brief.)

## II. *Standard of Review and Principles Governing Motions for Summary Judgment*

We review an order granting summary judgment or summary adjudication de novo. (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 858 (*Serri*), citing *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 (*Aguilar*).) If the trial court makes an evidentiary ruling on a motion for summary judgment, pursuant to the weight of authority, we review that ruling for abuse of discretion. (*Miranda v. Bomel Construction Co., Inc.* (2010) 187 Cal.App.4th 1326, 1335; see *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 255 [noting split of authority on standard for review]; *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535 [noting issue, but finding it unnecessary to decide the issue in that case].) Neither party challenges the trial court's evidentiary rulings in this case.

"In undertaking our independent review, we apply the same three-step analysis used by the trial court. First, we identify the issues framed by the pleadings. Second, we

12

determine whether the moving party has established facts justifying judgment in its favor. Finally, in most cases, if the moving party has carried its initial burden, we decide whether the opposing party has demonstrated the existence of a triable issue of material fact." (*Serri*, *supra*, 226 Cal.App.4th at pp. 858-859.)

A summary judgment motion "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A defendant moving for summary judgment meets this burden by presenting evidence demonstrating that one or more elements of each cause of action cannot be established or that there is a complete defense to the action. (*Id*., subd. (*o*)(2); *Aguilar*, *supra*, 25 Cal.4th at pp. 849-850, 853-854.) A defendant need not conclusively negate an element of the plaintiff's cause of action, but must show that one or more of its elements cannot be established. (*Aguilar*, at p. 853.) Once the defendant makes this showing, the burden shifts to the plaintiff to show that a triable issue of material fact exists as to that cause of action or defense. (Code Civ. Proc., § 437c, subd. (*o*)(2); see *Aguilar*, at p. 850.)

"[G]enerally, the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he [or she] carries his [or her] burden of production, he [or she] causes a shift, and the opposing party is then subjected to a burden of production of his [or her] own to make a prima facie showing of the existence of a triable issue of material fact. . . . A burden of production entails only the presentation of 'evidence.' (Evid. Code, § 110.)" (*Aguilar*, *supra*, 25 Cal.4th at p. 850.) This burden of production requires the parties to make a prima facie showing: "one that is sufficient to support the position of the party in question. [Citation.] No more is called for." (*Aguilar*, at pp. 850-851.)

### III.    *Monet's Evidence*

We begin with an analysis of Monet's evidence in opposition to the motion for summary judgment. If the moving party meets its initial burden, the party opposing a motion for summary judgment must produce *substantial* responsive evidence showing some triable issue of material fact. (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 166.) An opposition that contains no evidence, but simply asserts a right to a jury trial on the issues in the case, is insufficient. (See e.g., *Shepherd v. Jones* (1982) 136 Cal.App.3d 1049, 1062.) The opposing party cannot controvert the moving party's showing with evidence that is "based on speculation, imagination, guess work, or mere possibilities." (*Doe v. Salesian Society* (2008) 159 Cal.App.4th 474, 481.)

The party opposing summary judgment must produce *admissible* evidence raising a triable issue of material fact. (*Hayman v. Block* (1986) 176 Cal.App.3d 629, 639.) "The same rules of evidence that apply at trial also apply to the declarations submitted in support of and in opposition to motions for summary judgment. Declarations must show the declarant's personal knowledge and competency to testify, state facts and not just conclusions, and not include inadmissible hearsay or opinion." (*Bozzi v. Nordstrom, Inc.* (2010) 186 Cal.App.4th 755, 761.) In addition to admissible evidence, a summary judgment motion may be based on facts that the court must or may judicially notice under Evidence Code sections 451 and 452. (Code Civ. Proc., § 437c, subd. (b)(1).)

#### A. Declaration of Monet's Counsel

Monet did not file a declaration in opposition to the motion for summary judgment. Instead, he relied on the declaration of his counsel, Megan Dailey, and exhibits attached to his first amended complaint. Dailey's declaration attempts to introduce three documents into evidence: (1) the memorandum prepared by an unnamed source summarizing information obtained from Facebook, (2) an excerpt from a Form 8-

14

K that Countrywide Financial Corporation filed with the SEC, and (3) a screenshot from an FDIC website. In her declaration, Dailey made little effort to authenticate the documents. She did not even declare that the first two documents were true and correct copies of what they purport to be, although she did make such a declaration regarding the screenshot.

Dailey stated that the Form 8-K and the screenshot are judicially noticeable, but did not file a request for judicial notice or otherwise tell the court which provisions of the Evidence Code she was relying on in requesting judicial notice. (Rule 3.1350(e)(4) [request for judicial notice must be "separately stapled and titled" "request for judicial notice in opposition to [*moving party's*] motion for summary judgment . . ."; original italics].) " ' "Judicial notice is the recognition and acceptance by the court, for use by the trier of fact or by the court, of the existence of a matter of law or fact that is *relevant* to an issue in the action without requiring formal proof of the matter." ' " (*Poseidon Development, Inc. v. Woodland Lane Estates, LLC* (2007) 152 Cal.App.4th 1106, 1117, italics added.) The material Monet asked the court to judicially notice related to the 2008 merger between Countrywide and Bank of America, N.A. and the "2009 FDIC receivership of Countrywide assets." But those facts were not material or probative of anything related to the issues raised in the summary judgment motion, other than as background information. We therefore need not analyze further whether the documents were judicially noticeable, and we will not consider those documents.

The memorandum by an unnamed person about representations others made on Facebook is at least double hearsay. Dailey did not disclose who did the internet research or who authored the memorandum. And she made no effort to address the hearsay problem presented by this "evidence" or to demonstrate how it was otherwise admissible. It was therefore not properly before the trial court and will not be considered on appeal.

15

## B. Exhibits attached to Monet's First Amended Complaint

The only other evidence Monet presented in opposition to the motion were four exhibits that he had attached to his first amended complaint. As the trial court noted, a party may not rely on the allegations of his or her own pleadings as evidence in support of or in opposition to a motion for summary judgment, even if the pleadings are verified. (*College Hospital*, *supra*, 8 Cal.4th at p. 720, fn. 7.) Although Monet had verified his first amended complaint, he only authenticated some of the exhibits attached thereto by declaring that they were true and correct copies of what they purported to be.

Moreover, Monet did not make any effort to introduce the four exhibits into evidence in the summary judgment proceedings or to authenticate them in his opposition to the motion for summary judgment. (Rule 3.1350(e)(3) [evidence in opposition to motion for summary judgment must be separately "stapled and titled as [¶][¶] [*Opposing party's*] evidence in opposition to . . ."].) Instead, he merely cited to the exhibits in his separate statement. To complicate matters, the exhibit referenced in Monet's separate statement did not match the exhibit designations in the first amended complaint. For example, the separate statement cites "Compl., Ex. C" when Monet appears to be referring to Exhibit L to the first amended complaint. All four exhibits were misidentified in this way. In summary, copies of these four exhibits were not included in Monet's opposition papers, his citations to them in his separate statement were mislabeled, and some were not authenticated in any way. We shall briefly describe each exhibit.

The first exhibit (the Assignment) was included in Defendants' exhibits, was authenticated by Monet, and was properly in evidence. The second exhibit, a copy of Afzal's notary oath filed with the Ventura County Clerk, is self-authenticating because it contains the Secretary of State's stamp certifying that it is a true and correct copy. The third exhibit purports to be 25 substitutions of trustee, assignments, and notices signed by

16

Sevillano in other cases. Monet attached these substitutions to his first amended complaint to support the allegation in his fraud cause of action challenging Sevillano's authority to sign the Assignment. But the fraud cause of action was dismissed at the demurrer stage. On summary judgment, Monet used this exhibit to support his contention that the Assignment was invalid because Sevillano was a "robo-signer." He also asserted that the exhibit shows "multiple different signature styles all purporting to be T. Sevillano." But these signatures actually look very similar to one another. To the extent Monet seeks to prove that Sevillano's signature was forged or falsified, he needed to do more than provide a stack of documents. "Only an expert witness may testify to an opinion that a questioned writing is, or is not, the writing of the same person who is the author of the exemplars submitted to [the expert] for comparison." (1 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 4th ed. 2012) Authentication and Proof of Writings, § 31.18.) Without an expert, this evidence is too speculative to be considered on summary judgment. We shall therefore disregard it. The fourth exhibit is a partial copy of the PSA that does not include any signature pages. The first amended complaint alleges that it is a true and correct copy of the PSA that Monet obtained from the Internet.

On summary judgment, Monet had the burden to present admissible evidence that was substantial in nature. He could no longer rely on the allegations of his complaint. With this in mind, we turn to the question whether the parties have met their respective burdens on summary judgment.

## IV. *General Principles Regarding Deeds of Trust and Nonjudicial Foreclosure*

"The financing or refinancing of real property in California is generally accomplished by the use of a deed of trust." (*Jenkins v. JPMorgan Chase Bank, N.A.* (2013) 216 Cal.App.4th 497, 507 (*Jenkins*).) "There are three parties in the typical deed of trust: the trustor (debtor), the beneficiary (lender), and the trustee." (*Biancalana v.*

17

*T.D. Service Co.* (2013) 56 Cal.4th 807, 813 (*Biancalana*).)  A deed of trust *conveys title* to real property from the trustor (debtor) to a third party trustee to secure the payment of a debt owed to the beneficiary (lender) under a promissory note.  The customary provisions of a valid deed of trust include a power of sale clause, which empowers the beneficiary to foreclose on the real property security if the trustor fails to pay the debt owed under the promissory note.  (*Jenkins*, at p. 508.)  The deed of trust in this case granted the power of sale to both the trustee and the beneficiary, as well as the beneficiary's nominee, MERS.

Although the deed of trust technically conveys title to the real property from the trustor (debtor) to the trustee, "the extent of the trustee's interest in the property is limited to what is necessary to enforce the operative provisions of the deed of trust."  (*Jenkins*, *supra*, 216 Cal.App.4th at p. 508.)  Generally, a deed of trust requires the trustee to perform one of two "mutually exclusive duties":  (1) if the trustor (debtor) defaults on the debt, the trustee must initiate foreclosure on the property for the benefit of the beneficiary (lender); or (2) if the trustor satisfies the secured debt, the trustee must convey title to the real property back to the trustor, extinguishing the security device.  (*Ibid.*)  Despite the security interest the deed of trust creates, the trustor "retains all incidents of ownership with regard to the real property, including the rights of possession and sale."  (*Ibid.*)

When a borrower defaults on a debt secured by a deed of trust, the lender may elect to judicially or nonjudicially foreclose on the real property security.
" ' "Nonjudicial foreclosure is less expensive and more quickly concluded than judicial foreclosure, since there is no oversight by a court, '[n]either appraisal nor judicial determination of fair value is required,' and the debtor has no postsale right of redemption." ' "  (*Jenkins*, *supra*, 216 Cal.App.4th at pp. 508-510.)

The procedures to be followed in a nonjudicial foreclosure are governed by sections 2924 through 2924k.  (*Debrunner v. Deutsche Bank Nat. Trust Co.* (2012)

18

204 Cal.App.4th 433, 440 (*Debrunner*).)  Sections 2924 through 2924k set forth a
" 'comprehensive framework for the regulation of a *nonjudicial* foreclosure sale pursuant
to a power of sale contained in a deed of trust.'  [Citation.]"  (*Jenkins*, *supra*,
216 Cal.App.4th at p. 508, original italics; *Moeller v. Lien* (1994) 25 Cal.App.4th 822,
830.)  "These provisions cover every aspect of exercise of the power of sale contained in
a deed of trust."  (*I.E. Associates v. Safeco Title Ins. Co.* (1985) 39 Cal.3d 281, 285.)
"Notably, section 2924, subdivision (a)(1), permits a notice of default to be filed by the
'trustee, mortgagee, or beneficiary, or any of their authorized agents.' "  (*Debrunner*, at
p. 440.)  " 'Because of the exhaustive nature of this scheme, California appellate courts
have refused to read any additional requirements into the non-judicial foreclosure
statute.'  [Citations.]"  (*Gomes v. Countrywide Home Loans, Inc.* (2011) 192 Cal.App.4th
1149, 1154 (*Gomes*).)

"A nonjudicial foreclosure sale is presumed to have been conducted regularly and
fairly; one attacking the sale must overcome this common law presumption 'by pleading
and proving an improper procedure and the resulting prejudice.'  [Citation.]"  (*Knapp v.
Doherty* (2004) 123 Cal.App.4th 76, 86, fn. 4.)  Presumptions that may satisfy a party's
burden at trial may be used on a motion for summary judgment.  A presumption that
precludes the trier of fact from making a finding contrary to the presumption eliminates
the existence of a triable issue of fact when no contrary evidence is offered.  On summary
judgment, the " 'moving party is entitled to the benefit of any relevant presumptions, and
if the established facts and relevant presumptions would have entitled him to a directed
verdict at trial, he is entitled to a summary judgment . . . ."  (*Security Pac. Nat. Bank v.
Associated Motor Sales* (1980) 106 Cal.App.3d 171, 179-180.)

As we have stated, a nonjudicial foreclosure is "presumed to have been conducted
regularly, and the burden of proof rests with the party attempting to rebut this
presumption."  (*Fontenot v. Wells Fargo Bank, N.A.* (2011) 198 Cal.App.4th 256, 270

(*Fontenot*) [applying presumption in action for wrongful foreclosure brought after sale]; *Debrunner*, *supra*, 204 Cal.App.4th 433, 443 [applying presumption in action to prevent nonjudicial foreclosure sale from occurring].)  Therefore, a debtor who seeks to prevent a nonjudicial foreclosure based on the foreclosing entity's purported lack of authority must "affirmatively" plead and prove facts demonstrating a lack of authority.  (*Fontenot*, at p. 270; *Jenkins*, *supra*, 216 Cal.App.4th at p. 512 [to state a cause of action challenging a foreclosing entity's authority to conduct a nonjudicial foreclosure, the debtor must allege a "*specific factual basis*" establishing a lack of authority (original italics)]; *Gomes*, *supra*, 192 Cal.App.4th at pp. 1155-1156.)  A debtor may not bring a preemptive lawsuit seeking to force the foreclosing entity to prove its authority before conducting a nonjudicial foreclosure.  (*Jenkins*, at pp. 511-513.)  Allowing a judicial action to prevent a nonjudicial foreclosure without specific factual allegations showing a lack of authority "would unnecessarily 'interject the courts into [the] comprehensive nonjudicial scheme' created by the Legislature, and 'would be inconsistent with the policy behind nonjudicial foreclosure of providing a quick, inexpensive and efficient remedy.  [Citation.]' [Citation.]"  (*Id.* at p. 512; see also *Gomes*, at pp. 1154-1156.)

### V.  MERS

Monet's opening brief suggests he misunderstands the role of MERS under the Deed of Trust and in the foreclosure process.  For example, he argues:  "Because MERS could not have received the beneficial interest in [the] Deed of Trust as a successor to [Countrywide], it is not the true successor interest, nor the owner of the beneficial interest in [the] Deed of Trust, so MERS had no legal authority to make the assignment of the [Deed of Trust] to HSBC . . . ."  To clarify such misunderstandings, we will review the role of MERS in modern mortgage finance.

The " 'MERS System' " was "devised by the mortgage banking industry to facilitate the securitization of real property debt instruments. . . . MERS is a private corporation that administers a national registry of real estate debt interest transactions. Members of the MERS System assign limited interests in the real property to MERS, which is listed as a grantee in the official records of local governments, but the members retain the promissory notes and mortgage servicing rights. The notes may thereafter be transferred among members without requiring recordation in the public records. [Citation.] [¶] Ordinarily, the owner of a promissory note secured by a deed of trust is designated as the beneficiary of the deed of trust. [Citation.] Under the MERS System, however, MERS is designated as the beneficiary in deeds of trust, acting as 'nominee' for the lender, and granted the authority to exercise legal rights of the lender." (*Fontenot*, *supra*, 198 Cal.App.4th at p. 268.)

## VI. Causes of Action for Injunctive Relief, to Set Aside Trustee's Sale, for Wrongful Foreclosure, and to Void or Cancel the Trustee's Deed

Monet's first cause of action for injunctive relief, his third cause of action to set aside the trustee's sale, his fourth cause of action for wrongful foreclosure, and his eighth cause of action to void or cancel the Trustee's Deed all arise out of the alleged wrongful foreclosure of the Property. The gravamen of Monet's action is that Defendants did not have the power to foreclose because of alleged flaws in the securitization process and irregularities in the Assignment transferring the Deed of Trust and the Note to HSBC. On appeal, Monet treats these claims, and his quiet title cause of action, jointly. He argues that the "crux" of these causes of action is (1) "the propriety of the foreclosure process," and the fact that he qualifies for an exception to the tender requirement. (We will discuss the quiet title action separately, in another section.)

This court has stated the elements of an *equitable action* to set aside a trustee's sale: "(1) the trustee . . . caused an illegal, fraudulent, or willfully oppressive sale of real

21

property pursuant to a power of sale in a . . . deed of trust; (2) the party attacking the sale (usually but not always the trustor . . .) was prejudiced or harmed; and (3) in cases where the trustor . . . challenges the sale, the trustor . . . tendered the amount of the secured indebtedness or was excused from tendering." (*Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 104 (*Lona*).)  In *Chavez v. Indymac Mortgage Services* (2013) 219 Cal.App.4th 1052, the court concluded that a *cause of action for wrongful foreclosure* is based on these same elements.  (*Id.* at p. 1062, citing *Lona*.)

Monet's eighth cause of action to void or cancel the trustee's deed upon sale is based on the same allegations as his causes of action to set aside the trustee's sale and for wrongful foreclosure:  that HSBC was not the beneficiary of the Deed of Trust and lacked authority to foreclose.  If Defendants are entitled to summary judgment on a cause of action challenging the lawfulness of the trustee's sale, it follows that the eighth cause of action does not state facts sufficient for a cause of action to cancel the trustee's deed upon sale.  (See *McFarland v. JP Morgan Chase Bank* (C.D.Cal. Apr. 28, 2014, No. EDCV 13-01838-JGB (OPx)) 2014 U.S.Dist. Lexis 62145 [request for the cancellation of deed of trust is an equitable remedy that is dependent upon a substantive basis for liability and has no separate viability].)  Monet's first cause of action for injunctive relief is also derivative of his wrongful foreclosure claim and his cause of action to set aside the trustee's sale.  Monet sought to enjoin the foreclosure sale and any eviction proceedings that might follow the sale.  "Injunctive relief is a remedy and not, in itself, a cause of action, and a cause of action must exist before injunctive relief may be granted." (*Shell Oil Co. v. Richter* (1942) 52 Cal.App.2d 164, 168.)  Therefore, if the wrongful foreclosure and set aside claims were properly adjudicated in Defendant's favor, no cause of action exists upon which to premise the remedy of injunctive relief.

## A. Defendants Met Their Burden on Summary Judgment

The Deed of Trust identified Monet as the "Borrower," Countrywide as the "Lender," Recontrust as the "Trustee," and MERS as "acting solely as nominee for Lender and Lender's successors and assigns" and as the "beneficiary." These facts were undisputed. As noted earlier, the Deed of Trust provides: "Borrower irrevocably grants and conveys to Trustee, in trust, with the power of sale," the Property. The Deed of Trust also states: "Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right to exercise any of those interests, including, but not limited to, the right to foreclose and sell the Property . . . ." Thus, the Deed of Trust provided that: (1) MERS was the nominee for the lender and its successors and had the power of sale; and (2) Recontrust was the trustee and also had the power of sale.

Defendants presented evidence that Monet defaulted on the loan in April 2009 and failed to cure the default. Although Monet "disputed" these facts by arguing he was not in default as to the "true owner of the beneficial interest due to the break in the chain of title," he did not present any evidence to support that assertion or to create a triable issue on this point. There was no evidence that Monet made payments to anyone after April 2009 or that he deposited amounts owed on the loan in trust for the benefit of the "true" noteholder.

The Notice of Default was signed by an agent of Recontrust and recorded on June 7, 2010. The Notice of Sale was executed by a representative of Recontrust and recorded on September 13, 2010. The Trustee's Deed upon sale was also executed and recorded by Recontrust; it indicates that Recontrust exercised its power under the Deed of Trust and sold the Property on February 22, 2011. The Deed of Trust, Notice of Default, Notice of Sale and Trustee's Deed reveal that all of the activity related to the foreclosure

23

sale was undertaken by Recontrust, the original trustee, pursuant to the power of sale Monet granted to Recontrust in the Deed of Trust. This is not a case like *Dimock*—which Monet relies upon—where the trustee that conducted the sale had lost the power of sale because it had been substituted out before the sale took place. (*Dimock v. Emerald Properties, LLC* (2000) 81 Cal.App.4th 868, 877-878 (*Dimock*).)

*Fontenot* is instructive. In that case, the plaintiff alleged the foreclosure was unlawful because MERS lacked authority to transfer the note and deed of trust to the party to whom the deed of trust had been assigned, HSBC. (*Fontenot*, *supra*, 198 Cal.App.4th at pp. 260, 272.) The appellate court determined that "[e]ven if MERS lacked authority to transfer the note, it is difficult to conceive how plaintiff was prejudiced by MERS's purported assignment, and there is no allegation to this effect. Because a promissory note is a negotiable instrument, a borrower must anticipate it can and might be transferred to another creditor. As to plaintiff, an assignment merely substituted one creditor for another, without changing her obligations under the note. Plaintiff effectively concedes she was in default, and she does not allege that the transfer to HSBC interfered in any manner with her payment of the note [citation], nor that the original lender would have refrained from foreclosure under the circumstances presented. If MERS indeed lacked authority to make the assignment, the true victim was not [the] plaintiff but the original lender, which would have suffered the unauthorized loss of a $1 million promissory note." (*Id*. at p. 272.)

Here, Defendants presented evidence that the Assignment to HSBC was executed by Sevillano as a representative of MERS. It was dated June 4, 2010, notarized on June 9, 2010, and recorded on June 18, 2010. The Assignment does not indicate when it took effect. Monet "disputed" these facts, arguing that the Assignment was invalid because it was not transferred into the securitized trust by the closing date. He also suggested that the signatures of Sevillano & Afzal were forgeries. But, as we have stated, Monet's

24

evidence was insufficient to support his forgery theories.  And while Monet's evidence included a partial copy of the PSA, which contained the closing date for the securitized trust, he did not provide any evidence to support his contention that the Deed of Trust was not transferred to the securitized trust on time or that any purported delay was not otherwise excused.

"Any assignment of . . . the beneficial interest under a deed of trust *may* be recorded, and from the time the same is filed for record operates as constructive notice of the contents thereof to all person." (§ 2934, italics added.)  But an assignment *does not need to be recorded* to be effective between the assignor and the assignee. (See *Wilson v. Pacific Coast Title Ins. Co*. (1951) 106 Cal.App.2d 599, 602.)  Instead, it serves as constructive notice to any interested person that a transfer of interest took place prior to the recordation date.  A deed of trust " 'passes legal title to the trustee, "thus enabling him [or her] in executing the trust to transfer to the purchaser a marketable record title." ' " (*Haynes v. EMC Mortgage Corp*. (2012) 205 Cal.App.4th 329, 336.)  "[W]here a deed of trust is involved, the trustee may initiate foreclosure irrespective of whether an assignment of the beneficial interest is recorded." (*Ibid.*)  Thus, there was no requirement that the Assignment from MERS to HSBC be recorded prior to initiating nonjudicial foreclosure.  In addition, the Deed of Trust provided that the "Note . . . (together with [the Deed of Trust]) can be sold one or more times without prior notice to [Monet]."  That Monet was unaware that the Note had been transferred to HSBC or that HSBC did not record the assignment until after the Notice of Default was recorded did not preclude the trustee (Recontrust) from exercising the powers Monet granted to it in the Deed of Trust.

Like Monet, the plaintiff in *Fontenot* alleged that "MERS lacked the authority to assign the note because it was merely a nominee of the lender and had no interest in the note." (*Fontenot*, *supra*, 198 Cal.App.4th at p. 270.)  The *Fontenot* court rejected that assertion, stating:  "Contrary to [the] plaintiff's claim, the lack of a possessory interest in

25

the note did not necessarily prevent MERS from having the authority to assign the note. While it is true MERS had no power in *its own right* to assign the note, since it had no interest in the note to assign, MERS did not purport to act for its own interests in assigning the note. Rather, the assignment of deed of trust states that MERS was acting as nominee for the lender, which *did* possess an assignable interest. A 'nominee' is a person or entity designated to act for another in a limited role—in effect, an agent. [Citations.] The extent of MERS's authority as a nominee was defined by its agency agreement with the lender, and whether MERS had the authority to assign the lender's interest in the note must be determined by reference to that agreement. [Citations.] Accordingly, the allegation that MERS was merely a nominee is insufficient to demonstrate that MERS lacked authority to make a valid assignment of the note on behalf of the original lender." (*Id.* at pp. 270-271, original italics.)

In view of the evidence presented to the trial court and the legal principles set forth above, we hold that Defendants made a prima facie showing that the foreclosure sale was conducted in accordance with the statutory scheme for nonjudicial foreclosures and the terms of the Deed of Trust. Monet could not establish the first element of these causes of action—that the trustee caused an illegal, fraudulent or willfully oppressive sale of the Property. We also hold that Defendants' showing shifted the burden to Monet to demonstrate a triable issue of material fact, which he failed to do. We next address Monet's arguments on appeal about the propriety of granting summary adjudication of the first, third, fourth and eighth causes of action.

### B. Alleged Violation of Section 2923.5

Monet argues that the foreclosure sale violated section 2923.5.

"In 2008, the Legislature enacted . . . section 2923.5 in response to the foreclosure crisis." (*Stebley v. Litton Loan Servicing, LLP* (2011) 202 Cal.App.4th 522, 525.) When

Recontrust recorded the Notice of Default in 2010, former section 2923.5[1] prohibited a "mortgagee, trustee, beneficiary, or authorized agent" from recording a notice of default until 30 days after (1) "contact[ing] the borrower in person or by telephone in order to assess the borrower's financial situation and explor[ing] options for the borrower to avoid foreclosure"; or (2) making diligent efforts to contact the borrower, including "sending a first-class letter that includes the toll-free telephone number made available by HUD to find a HUD-certified counseling agency," "attempt[ing] to contact the borrower by telephone at least three times at different hours and on different days," and "send[ing] a certified letter, with return receipt requested." (Former § 2923.5, subds. (a) & (g).) Former section 2923.5 also required that a notice of default include a declaration stating that "the mortgagee, beneficiary, or authorized agent . . . has contacted the borrower [or] tried with due diligence to contact the borrower as required by this section . . . ." (Former § 2923.5, subd. (b).) The section 2923.5 declaration "may simply track the statutory language regarding the mortgagee, beneficiary, or authorized agent's efforts to contact the borrower" and need not be signed under penalty of perjury. (*Rossberg*, *supra*, 219 Cal.App.4th at p. 1494, citing *Mabry v. Superior Court* (2010) 185 Cal.App.4th 208, 232-235 (*Mabry*).)

Defendants' evidence included a copy of the Notice of Default. As we have noted, attached thereto was a declaration from Lorraine Young, a "Loan Svcs Specialist" with

---

[1] The Legislature amended section 2923.5 in 2012. (Stats. 2012, ch. 86 (A.B.278), § 4; Stats. 2012, ch. 87 (S.B.900), § 4.) "The basic requirements nonetheless remain that a mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent may not record a notice of default until more than 30 days after they contact the borrower to assess the borrower's financial situation and explore options to avoid foreclosure, or make diligent efforts to contact the borrower for those purposes. The current version continues to require a notice of default include a declaration stating the mortgage servicer contacted the borrower or made diligent efforts to do so. (§ 2923.5, subds.(a), (b), (e).)" (*Rossberg v. Bank of America, N.A.* (2013) 219 Cal.App.4th 1481, 1494, fn. 8 (*Rossberg*).)

27

Bank of America, signed under penalty of perjury, which stated that the loan servicer had "tried with due diligence to contact the borrower in accordance with . . . Section 2923.5." The declaration in this case, like the one in *Mabry*, tracked the statutory language and was sufficient to shift the burden to Monet to present evidence that created a triable issue of fact on the question whether Defendants complied with the requirements of section 2923.5.  (*Mabry*, at pp. 214, 216, 235.)

Citing allegations in the first amended complaint and argument in his memorandum of points and authorities in opposition to the motion for summary judgment, Monet argues that "none of the foreclosing parties contacted [him] to discuss his financial situation despite [his] numerous attempts to contact, explain, or discuss the situation with the mortgagors in order to negotiate a feasible alternative to foreclosure." But Monet's opposition did not include any evidence that supported this assertion or that controverted Young's declaration.  Monet was required to present *admissible evidence* that created a triable issue on this point; he could not rely on mere argument or the allegations of his complaint.  We therefore hold that Defendants have met their burden of establishing that Monet could not state causes of action for wrongful foreclosure, to set aside the trustee's sale, or to cancel the Trustee's Deed based on alleged violations of section 2923.5.  This shifted the burden to Monet to present admissible evidence that created one or more triable issues of fact relating to these causes of action, which he failed to do.  Therefore, the trial court did not err with respect to these causes of action.

## C. Securitization

Monet argues that "once [Countrywide] began the securitization process and did not record the sale pursuant to the mortgage loan purchase agreement (MPLA), or the

28

[PSA], MERS was severed from the [Deed of Trust] as the nominee and beneficiary."[2] Later, Monet states that he does not challenge legal securitization, but challenges the late transfer of the Deed of Trust and the Note into the trust in violation of the PSA.

Even if Monet were correct in his assertions, "the relevant parties to such a transaction were the holders (transferors) of the promissory note and the third party acquirers (transferees) of the note. . . . As an unrelated third party to the alleged securitization, and any other subsequent transfers of the beneficial interest under the promissory note, [Monet] lacks standing to enforce any agreements, including the investment trust's pooling and servicing agreement, relating to such transactions." (*Jenkins*, *supra*, 216 Cal.App.4th at p. 515.) Thus, even if the transfer to the securitized trust was invalid, Monet was "not the victim of such invalid transfers because [his] obligations under the note remained unchanged." (*Ibid.*) "Instead, the true victim may be an individual or entity that believes it has a present beneficial interest in the promissory note and may suffer the unauthorized loss of its interest in the note." (*Ibid.*; see also *Almutarreb v. Bank of New York Trust Co., N.A.* (N.D.Cal. Sept. 24, 2012, C-12-3061 EMC) 2012 WL 4371410 [joining federal district courts in holding that "because Plaintiffs were not parties to the PSA . . . , they lack standing to challenge the validity of the securitization process, including whether the loan transfer occurred outside the temporal bounds prescribed by the PSA"]; *Baldoza v. Bank of Am., N.A.*, (N.D.Cal. Mar. 12, 2013) 2013 U.S.Dist. Lexis 34323, at pp. *25-26 [majority of Ninth Circuit district courts hold that borrowers lack standing to challenge noncompliance with a PSA in securitization unless they are parties to the PSA or third party beneficiaries of the PSA].)

---

[2] When he references the MPLA, it is not clear whether Monet means the Note or some other contract related to the securitization process. Monet does not provide a record citation to the MPLA and, based on our review, there is no such document in the record. We will therefore disregard Monet's reference to the MPLA.

Monet argues that we should follow the cases the court relied on in *Glaski v. Bank of America* (2013) 218 Cal.App.4th 1079, "that acts in contravention of the trust are void and not *voidable*," and hold that the late assignment to the securitized trust rendered the assignment in this case void, which in turn means that HSBC did not have authority to foreclose. (*Id.* at p. 1096, original italics.) In *Glaski*, after concluding that noncompliance with the terms of a pooling and servicing agreement would render an assignment void, the court adopted without analysis the majority rule in Texas that an obligor (i.e., a borrower or debtor) may resist foreclosure on any ground that renders an assignment in the chain of title void. (*Id.* at pp. 1095-1098; *Reinagel v. Deutsche Bank Nat'l Trust Co.* (5th Cir.Tex.2013) 722 F.3d 700, 705.)

No California court has followed *Glaski* on this point, and many have disagreed with it. (See, e.g., *Apostol v. Citimortgage, Inc.* (N.D.Cal. Nov. 21, 2013) 2013 WL 6328256, at pp. *6–7; *Dahnken v. Wells Fargo Bank, N.A.*, (N.D.Cal. Nov. 8, 2013, C 13–2838 PJH) 2013 WL 5979356; see also *Sandri v. Capital One* (Bankr. N.D.Cal. 2013) 501 B.R. 369; [explicitly rejecting holding of *Glaski* on the standing issue]; *Haddad v. Bank of America, N.A.* (S.D.Cal. 2014) 2014 WL 67646 at p. *4 [citing numerous decisions rejecting *Glaski*].) Furthermore, *Jenkins* is directly to the contrary.

The California Supreme Court has granted review in a trio of cases that address the standing issue raised in *Glaski* and *Jenkins*. (*Yvanova v. New Century Mortgage Co.* (2014) 226 Cal.App.4th 495, review granted August 27, 2014, S218973 [Issue to be reviewed: in an action for wrongful foreclosure, does the borrower have standing to challenge an assignment of the note and deed of trust on the basis of defects allegedly rendering the assignment void?]; *Keshtgar v. U.S, Bank, N.A.* (2014) 226 Cal.App.4th 1201, review granted Oct. 1, 2014, S220012 [grant & hold for *Yvanova*]; *Mendoza v. JPMorgan Chase, N.A.* (2014) 228 Cal.App.4th 1020, review granted Nov. 12, 2014 [same].)

30

Even if Monet had standing to challenge the assignment of the Note and Deed of Trust, any infirmity in the securitization process would not have relieved him of his obligation to make the payments required under the Deed of Trust.  The observation made by the court in *Siliga v. Mortgage Electronic Registration Systems, Inc.* (2013) 219 Cal.App.4th 75, 85, applies here too:  Monet "fail[s] to allege any facts showing that [he] suffered prejudice as a result of any lack of authority of the parties participating in the foreclosure process.  [Monet does] not dispute that [he is] in default under the note. The assignment of the deed of trust and the note did not change [Monet's] obligations under the note, and there is no reason to believe that  . . . the original lender would have refrained from foreclosure in these circumstances.  Absent any prejudice, [Monet has] no standing to complain about any alleged lack of authority or defective assignment."  (*Id*. at p. 85, citing *Herrera v. Federal National Mortgage Assn.* (2012) 205 Cal.App.4th 1495, 1507-1508 and *Fontenot*, *supra*, 198 Cal.App.4th at p. 272 [plaintiff in wrongful foreclosure suit must show that "the alleged imperfection in the foreclosure process was prejudicial to the plaintiff's interests"].)  We likewise conclude that Monet's argument that the securitization somehow nullified his obligation to make loan payments has no merit.

## D. Tender Requirement

To obtain equitable relief to *set aside* a foreclosure sale, a defaulted borrower must tender the full amount of the debt for which the property served as security.  (*Dimock*, *supra*, 81 Cal.App.4th at pp. 877-878.)  "This requirement is based on the theory that one who is relying upon equity in overcoming a voidable sale must show that he [or she] is able to perform his [or her] obligations under the contract so that equity will not have been employed for an idle purpose."  (*Id*. at p. 878, italics omitted.)

31

As we have stated, the third element of a cause of action to set aside a foreclosure sale requires proof that the borrower tendered the debt or was excused from tendering. (*Lona*, *supra*, 202 Cal.App.4th at p. 104.) Case law has recognized four exceptions to the tender requirement in actions to set aside a foreclosure sale: (1) the borrower attacks the validity of the debt (e.g. based on fraud); (2) the borrower has a counter-claim or set-off sufficient to cover the amount due; (3) it would be inequitable as to a party not liable for the debt; or (4) the trustee's deed is void on its face (e.g., because the trustee lacked power to convey property). (*Id*. at pp. 112-113.) Monet relies on the third and fourth exceptions to the tender rule. His principal contention is that he is excused from tendering because it would be inequitable to require a tender since he is challenging Defendants' authority to foreclose.

Since we conclude that Defendants are entitled to summary adjudication of the first, third, fourth, and eighth cause of action because Monet cannot establish the first element of the claim—that the trustee caused an illegal, fraudulent, or willfully oppressive sale of real property pursuant to a power of sale in a deed of trust—we need not address Monet's arguments related to tender (the third element of his claim). We thus conclude the trial court did not err when it granted summary adjudication of these four claims.

## VII.   *Ninth Cause of Action to Quiet Title*

The elements of an action to quiet title are: (1) "the plaintiff is the owner and in possession of the land," and (2) "the defendant claims an interest therein adverse to [the plaintiff]." (*South Shore Land Co. v. Petersen* (1964) 226 Cal.App.2d 725, 740-741; see also Code Civ. Proc., § 761.020.) Generally, a borrower may not quiet title against a secured lender without first paying the outstanding debt on which the mortgage or deed of trust is based. (*Miller v. Provost* (1994) 26 Cal.App.4th 1703, 1707 ["mortgagor of

32

real property cannot, without paying his debt, quiet his title against the mortgagee"]; *Aguilar v. Bocci* (1974) 39 Cal.App.3d 475, 477 [borrower cannot quiet title without discharging the debt].) A cloud on title remains until the debt is paid. (*Burns v. Hiatt* (1906) 149 Cal. 617, 620-622.) In *Lueras v. BAC Home Loans Servicing, LP* (2013) 221 Cal.App.4th 49 (*Lueras*), the court observed that cases that examine the tender rule in the context of actions to set aside or prevent a foreclosure sale did not apply to an action to quiet title, "which [the borrower] cannot do without paying the outstanding indebtedness." (*Id.* at p. 87.) Thus, while there are exceptions to the tender requirement that apply to actions to set aside a foreclosure sale, the failure to tender amounts due under a loan is fatal to a cause of action to quiet title.

The parties do not brief the question whether the tender requirement is an element of the cause of action or an affirmative defense. But whether it is an element or an affirmative defense, it may serve as the basis for Defendants' motion for summary adjudication. (Code Civ. Proc., § 437c, subd. (p)(2).)

As discussed earlier, Monet relies on exceptions to the tender rule that do not apply to this claim. He also argues that he did in fact offer to tender in his notice of rescission. Monet's first amended complaint alleged that on March 31, 2010, he sent an unnamed entity a "Notice of Recession [*sic*] of Contract," because he "was never provided with TILA Disclosures, or Right to Cancel documents." Monet alleged that the notice of rescission stated he "was willing and able to tender all sums due to the 'lender' " and that he never received a response.

Defendants' undisputed material facts (UMF) stated that Monet had defaulted on the loan, was $73,047.83 in arrears as of June 2010, and that he did not cure the default prior to the foreclosure sale. (See UMF's Nos. 4, 5, 7, 8.) Defendants thus met their burden of showing Monet's failure to tender.

33

Monet's separate statement in opposition "disputed" each of these facts on other grounds, but made no reference to the alleged tender in March 2010 or the notice of rescission. Monet did not attach a copy of the notice of rescission to his pleading. More importantly, he did not present any evidence regarding the alleged tender in his opposition to the motion for summary judgment. Since no argument or evidence of the alleged tender was presented to the trial court, we conclude that Monet did not meet his burden of production to create a triable issue on this point. As we have stated, Monet may not rely on the allegations of his first amended complaint to create a triable issue. Thus, there were no triable issues related to the quiet title action and the court did not err when it granted summary adjudication of that claim based on a failure to tender.

## VIII. *Negligence*

The elements of a cause of action for negligence include: (1) a duty to use due care, and (2) a breach of that duty (3) that proximately causes (4) the plaintiff's damages. (*Mark K. v. Roman Catholic Archbishop* (1998) 67 Cal.App.4th 603, 611.) " 'The threshold element . . . is the existence of a duty to use due care toward an interest of another that enjoys legal protection against unintentional invasion. . . . [¶] Recognition of a duty to manage business affairs so as to prevent purely economic loss to third parties in their financial transactions is the exception, not the rule, in negligence law.' " (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 57-58.)

Defendants moved for summary adjudication of the negligence cause of action based on the propriety of the foreclosure and arguments about Monet's lack of standing to challenge the securitization. They also argued that Monet could not establish they owed him a duty of care. We turn to the latter point.

"Lenders and borrowers operate at arm's length." (*Lueras*, *supra*, 221 Cal.App.4th at p. 63.) As a general rule, a financial institution owes no duty of care

34

to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money. (*Nymark v. Heart Fed. Savings & Loan Assn*. (1991) 231 Cal.App.3d 1089, 1095-1096 (*Nymark*), citing *Wagner v. Benson* (1980) 101 Cal.App.3d 27, 34-35 [A "special relationship" between a lender and borrower exists only in those situations "when the lender 'actively participates' in the financed enterprise 'beyond the domain of the usual money lender' "].) In the recent spate of foreclosure litigation, lenders often rely on this general rule, as Defendants do here, to challenge a cause of action for negligence on the grounds that the lender had no duty to the borrower. (See e.g., *Lueras*, at pp. 62, 64-65 and cases cited therein; *Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872 (*Jolley*); and *Alvarez v. BAC Home Loans Servicing, L.P*. (2014) 228 Cal.App.4th 941, 944-945.)

But, "[e]ven when the lender is acting as a conventional lender, the no-duty rule is only a general rule." (*Jolley, supra*, 213 Cal.App.4th at p. 901.) In *Nymark*, the court held that a lender owed no duty of care to a borrower in preparing an appraisal for a loan when the purpose of the appraisal was to protect the lender by demonstrating that the collateral provided adequate security for the loan. (*Nymark, supra*, 231 Cal.App.3d at p. 1092.) As part of its analysis, the *Nymark* court considered the test for determining the existence of a duty as set forth in *Biakanja v. Irving* (1958) 49 Cal.2d 647 (*Biakanja*). In *Biakanja*, the California Supreme Court explained that the determination whether the defendant in a specific case "will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors," including: (1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct, and (6) the policy of preventing future harm. (*Ibid*. at p. 650.)

35

Analyzing these factors, the *Nymark* court concluded that the purpose of the appraisal was to protect the lender's interest and was not intended to assure the borrower the collateral was sound or to induce him to enter into the loan transaction.  (*Nymark*, *supra*, 231 Cal.App.3d at p. 1099.)  The court reasoned that the foreseeability of harm to the borrower—who would know the value of his own property—was remote, the connection between the lender's conduct and the injury suffered was "tenuous," there was "no moral blame because [the borrower] was in a position to protect himself from loss," and a strong public policy prevented imposing a duty of care on the lender in the preparation of an appraisal.  (*Id.* at pp. 1099-1100.)  As the court stated in *Jolley*, " '*Nymark* does not support the sweeping conclusion that a lender never owes a duty of care to a borrower.  Rather, the *Nymark* court explained that the question of whether a lender owes such a duty requires "the balancing of [the '*Biakanja* factors'] . . . .' ' " (*Jolley*, *supra*, 213 Cal.App.4th at p. 901; brackets in *Jolley*.)

**Analysis**

The first step of our analysis is to identify the issues as framed by the pleadings. (*Serri*, *supra*, 226 Cal.App.4th at p. 858.)  We therefore begin by identifying the allegedly negligent conduct described in the first amended complaint.

Monet alleged that (1) Recontrust, as trustee under the Deed of Trust, owed him a duty to exercise reasonable care and skill under the foreclosure laws (§ 2924 et seq.) and the terms of the Deed of Trust; (2) HSBC, as the "purported" beneficiary under the Note and Deed of Trust, owed Monet a duty to discharge its contractual duties with reasonable care; and (3) Recontrust and Bank of America had a duty to exercise reasonable care in enforcing monetary obligations under the Note and to refrain from taking action outside the scope of their authority, including demanding payments or foreclosing when they had no right to do so.  Monet alleged that Recontrust breached its duties by (1) failing to carry

36

out the foreclosure according to the strict requirements of section 2924 et seq.; (2) fabricating documents, (3) allowing its employees or agents to execute documents attesting to facts of which they had no personal knowledge, and (4) misrepresenting the true owner of the Note. He also alleged that HSBC breached its duties "when it aided and abetted" Recontrust in misrepresenting the identity of the noteholder. And he asserted that breaches of duty by Recontrust could be imputed to the other defendants.

Monet's negligence cause of action is based on broad, general allegations that Defendants failed to foreclose in accordance with the requirements of section 2924 and the Deed of Trust. But we have already concluded that Defendants met their burden of showing that Monet could not establish that the foreclosure was illegal, fraudulent, or willfully oppressive. This shifted the burden to Monet to present evidence that would create a triable issue on the question of whether Defendants owed him a duty of care.

Monet alleged that the trustee acted outside the scope of its authority and that documents (presumably he means the Assignment and related documents) were fabricated. But he presented no evidence that Sevillano was not authorized to sign the Assignment or that her signature or that of the notary were forgeries. Claims and theories that are not supported by admissible evidence do not raise triable issues of fact. (*Rochlis v. Walt Disney Co*. (1993) 19 Cal.App.4th 201, 219, disapproved on another ground as stated in *Turner v. Anheuser-Busch, Inc*. (1994) 7 Cal.4th 1238.) In addition, Monet did not assert that such evidence "may exist" but could "not then be presented" or tell the court that he needed a continuance to conduct further discovery. (Code Civ. Proc., § 437c, subd. (h); *Lewinter v. Genmar Industries, Inc*. (1994) 26 Cal.App.4th 1214, 1224 [failure to request a continuance to conduct further discovery waives the right to further discovery].) In fact, the record suggests Monet conducted no discovery. And when it came time to oppose summary judgment, he relied on the averments of his verified complaint and did not submit any material evidence.

37

Monet did not submit any evidence that Defendants did anything to induce him not to make his monthly loan payments or that caused or exacerbated his initial default by negligently servicing the loan. (*Lueras*, *supra*, 221 Cal.App.4th at p. 67.) Allegations that lenders and trustees owe borrowers duties to " 'follow through on their own agreements,' to comply with consumer protection laws, and to stop foreclosure sales that were unlawful fail to state a cause of action for negligence." (*Ibid*.) Monet did not present any evidence that Defendants' involvement in the loan transaction exceeded the scope of their conventional roles as a lender of money, trustee, or nominee under the Deed of Trust or that created a triable issue of fact on the question of duty. Thus, Defendants met their burden of showing they did not owe Monet a duty of care. (*Nymark*, *supra*, 231 Cal.App.3d at pp. 1095-1096.) Monet does not present any argument regarding the *Biakanja* factors or articulate any policy reasons that would support imposing a duty in this case, thereby deviating from the general rule. For these reason, we conclude that Monet cannot establish the duty element of a cause of action for negligence and that the trial court did not err when it granted summary adjudication of that cause of action.

Citing sections "4, 9, and 11 et seq." of the PSA, Monet argues that HSBC owed him a duty of care arising out of the PSA, including "a duty of distribution, reporting, indemnification, and to defend." But Monet did not allege such a duty in his first amended complaint. Since the issues on summary judgment are framed by the pleadings, and this purported duty was not alleged in the operative pleading, we shall not consider the argument further. Sections 9 through 11 of the PSA and the 18 exhibits attached to the PSA (some of which Monet cites to support this argument) are not in the record. This is yet another basis for us to disregard this argument. (*Pulver*, *supra*, 182 Cal.App.3d at p. 632 [appellate court will disregard arguments based on matter outside the record]; Rule 8.204(e).)

38

Monet's opening brief also contains arguments regarding the other elements of a cause of action for negligence:  breach, legal cause, and damages.  But Defendants' motion for summary adjudication was based on the duty element.  We shall therefore disregard Monet's arguments regarding the other elements.

## VI. Unfair Business Practices (Bus. & Prof. Code, § 17200 et seq.)

Monet's sixth cause of action alleged that Defendants engaged in "unlawful, fraudulent and deceptive practices" in violation of California's unfair competition law (UCL), Business and Professions Code section 17200 et seq.

### A. The UCL

"The UCL prohibits, and provides civil remedies for, unfair competition, which it defines as 'any unlawful, unfair or fraudulent business act or practice.'  (§ 17200.)  Its purpose 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.'  (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 949, . . . .)  In service of that purpose, the Legislature framed the UCL's substantive provisions in ' "broad, sweeping language" ' [citations] and provided 'courts with broad equitable powers to remedy violations' [citation]."  (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 320, citing *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 181 (*Cel-Tech*) and *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1266 ["The Legislature intended this 'sweeping language' to include ' "anything that can properly be called a business practice and that at the same time is forbidden by law." ' "]).)  The UCL "governs 'anti-competitive business practices' as well as injuries to consumers, and has as a major purpose 'the preservation of fair business competition.' "  (*Cel-Tech*, at p. 180.)

Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three types of unfair competition: acts or practices that are (1) unlawful, or (2) unfair, or (3) fraudulent. (*Cel-Tech*, *supra*, 20 Cal.4th at p. 180.) " ' "In other words, a practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa." ' " (*Ibid.*) On appeal, Monet relies on the "unlawful" and "fraudulent" prongs of the UCL. His complaint did not allege a claim under the unfair prong and he does not brief that issue on appeal. Since the issues on summary judgment are framed by the pleadings and Monet does not present any argument under the "unfair" prong, we conclude that he has forfeited any claims based on that prong.

### B. Allegations in First Amended Complaint and Arguments on Summary Judgment

Monet's first amended complaint contained broad, general allegations that Defendants had violated a number of statutes, without specifying the manner in which Defendants had violated each code section or which defendant had engaged in the allegedly unlawful conduct. For example, Monet alleged that "Defendants' conduct, for the reason stated herein, is in direct violation of [sections] 2924 *et seq*.," section 2924f, subdivision (c)(2), and section 2932.5. He also alleged violations of "several California laws, of TILA 15 U.S.C. § 1641, Cal. Penal Code section 532(f)(a)(4) and regulations." And he alleged that "Defendants engage[d] in unlawful, fraudulent and deceptive business practices with respect to loan servicing and assignment of the Note and Deed of Trust and related matters" in numerous other ways.

Defendants moved for summary adjudication of the unfair competition claim on the ground that it was "premised on the flawed legal theory that Defendants did not have the 'legal right' to foreclose," which Defendants had already disposed of in relation to Monet's other claims. They argued that Monet could not state a cause of action for unfair competition because he could not (1) prove that he had "suffered injury in fact and has

40

lost money or property," (2) establish that he had been injured by a specific defendant, or (3) prove that any specific defendant had violated California law. Defendants asserted they had no liability under the fraud prong of the UCL since Monet's fraud cause of action had been dismissed. In opposition, Monet made the same arguments as before about the alleged invalidity of the foreclosure documents (i.e., that Recontrust lacked the authority to foreclose, that HSBC was a stranger to the loan, etc.). Regarding damages, he asserted that he had lost his home and incurred legal expenses.

## C. Analysis under the Unlawful Prong of the UCL

"By proscribing 'any unlawful' business practice, 'section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable." (*Cel-Tech*, *supra*, 20 Cal.4th at p. 180.) If the complaint fails to state a violation of an underlying statute, a derivative claim of liability under the UCL based on the same statute also fails. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 329 [since the defendants' conduct did not violate the Cartwright Act, it was not unlawful under the UCL]; *Prachasaisoradej v. Ralphs Grocery Co., Inc.* (2007) 42 Cal.4th 217, 244; *Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th. 700, 718-719 [defendant insurers' conduct, which did not violate Insurance Code section 11580.2, not unlawful under the UCL].)

On appeal, Monet relies on five of the legal violations alleged in his pleading as the basis for a UCL claim under the unlawful prong: "(1) Failing to disclose the principal for which documents were being executed and recorded in violation of . . . [section] 1095"; (2) "Failing to record Powers of Attorney in connection with other recorded documents in violation of [section] 2933"; (3) violating "several California laws, [(4)] including TILA . . . , [and] [(5)] . . . Penal Code [section] 532(f)(a)(4)." The only argument he provides in support of these claims is: "The above allegations lay out all of

41

the elements necessary to establish a claim for Violation of [the UCL]." He also asserts that he "has established that there is a material issue of fact relating to this cause of action that should be decided by a jury." However, he provides no citation to legal authority and does not discuss the evidence actually put before the trial court.

Section 1095 states: "When an attorney in fact executes an instrument transferring an estate in real property, he must subscribe the name of his principal to it, and his own name as attorney in fact." It is not clear which of the recorded documents the alleged violation of section 1095 refers to. Assuming the alleged violations of section 1095 and Penal Code section 532f, subdivision (a)(4) refer to the Assignment, which was executed by Sevillano on behalf of MERS, Monet had agreed in the Deed of Trust that MERS was the nominee for the lender and the lender's successors and assigns. And although Monet alleged Sevillano's signature was forged or that she did not have the authority to sign the document, on summary judgment, he did not present any evidence that supported those allegations or created a triable issue on this point.

Section 2933 provides: "A power of attorney to execute a *mortgage* must be in writing, subscribed, acknowledged, or proved, certified, and recorded in like manner as powers of attorney for grants of real property." (Italics added.) This case involves a promissory note and a deed of trust, not a mortgage. Monet does not cite any legal authority extending the statute to promissory notes or deeds of trust. And Monet does not question his own authority or that of his wife, Lyda, to sign the Note or the Deed of Trust. Since section 2933 does not apply, it cannot be the basis of Monet's UCL claim under the unlawful prong.

The TILA is a complex set of statutes (15 U.S.C. §§ 1601-1666J), implementing regulations known as Regulation Z (12 CFR pt. 1026) and Official Interpretations of the regulations. (2 Bernhardt, Cal. Mortgages, Deeds of Trust, and Foreclosure Litigation (Cont.Ed.Bar 2009) § 13.11 (rev. 1/14).) The bald assertions that Defendants violated

42

"several California laws" and the TILA are too broad to provide a basis for a UCL claim under the unlawful prong. (*Khoury v. Maly's California, Inc.* (1993) 14 Cal.App.4th 612, 616 [demurrer dismissal affirmed where the plaintiff had failed to identify which section of the law had been violated or describe with any particularity the facts supporting the violation].)

Penal Code section 532f, subdivision (a)(4) provides that "[a] person commits mortgage fraud if, with the intent to defraud, the person . . . files or causes to be filed with the recorder of any county in connection with a mortgage loan transaction any document the person knows to contain a deliberate misstatement, misrepresentation, or omission." Monet's pleading does not explain how Defendants violated this statute, identify which recorded document the claim is based on, or which person recorded the allegedly fraudulent document or documents. On appeal, Monet does not provide any citation to legal authority other than the bald assertion that Defendants violated this statute.

### D. Analysis under the Fraudulent Prong of the UCL

A fraudulent business practice under the UCL "require[s] only a showing that members of the public are likely to be deceived" by the practice and "can be shown even without allegations of actual deception, reasonable reliance and damage." (*Daugherty v. American Honda Motor Co., Inc.* (2006) 144 Cal.App.4th 824, 838.) "A claim based upon the fraudulent business practice prong of the UCL is 'distinct from common law fraud. "A [common law] fraudulent deception must be actually false, known to be false by the perpetrator and reasonably relied upon by a victim who incurs damages. None of these elements are required to state a claim for . . . relief" under the UCL. [Citations.] This distinction reflects the UCL's focus on the defendant's conduct, rather than the plaintiff's damages, in service of the statute's larger purpose of protecting the general public against unscrupulous business practices.' " (*Morgan v. AT&T Wireless Services,*

43

*Inc*. (2009) 177 Cal.App.4th 1235, 1255.) A fraudulent business practice " ' "may be accurate on some level, but will nonetheless tend to mislead or deceive. . . . A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under" ' the UCL." (*McKell v. Washington Mutual, Inc*. (2006) 142 Cal.App.4th 1457, 1471 (*McKell*).)

On appeal, Monet relies on the following conduct as the basis for his UCL claim under the fraudulent prong: (1) "Executing and recording false and misleading documents"; (2) "Demanding and accepting payments for debts that were non-existent"; (3) "Reporting payments as late to credit bureaus without the legal right or authority to do so"; and (4) "Acting as a beneficiary without the legal authority to do so."[3]

Other than the brief argument we quoted above, Monet does not explain how the allegations of the complaint state a claim under the fraudulent prong of the UCL. On appeal, the trial court's judgment is presumed to be correct and the appellant has the burden of overcoming this presumption of correctness. (*Cahill v. San Diego Gas & Electric Co*. (2011) 194 Cal.App.4th 939, 956.) That burden includes presenting reasoned argument and legal authority on each point raised. " ' "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." ' [Citation.] 'We are not bound to develop appellants' argument for them. [Citation.] The absence of cogent legal argument or citation to authority allows this court to treat the contention as waived.' " (*Ibid*., citing *In*

---

[3] The UCL cause of action also alleged unlawful and fraudulent practices based on: "(b) Executing and recording documents without legal authority to do so; [¶][¶](e) violating the Security First Rule; [¶][¶] and; (i) other deceptive business practices as described herein." Monet does not brief these theories on appeal. Nor does he discuss the alleged violations of sections 2924 *et seq*., 2924f, subdivision (c)(2), or section 2932.5 under either the unlawful or fraudulent prong of the UCL. We therefore conclude that he has abandoned these allegations as bases for his UCL claim.

44

*re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830.) This rule applies to summary judgment appeals. Even though we review the trial court's ruling de novo, our scope of review is limited to those issues that have been adequately raised and supported in the appellant's brief. (*Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466.) Since Monet has failed to provide reasoned argument and citation to authority on the question whether he can state a cause of action under the fraudulent prong of the UCL, we treat that contention as waived and will pass it without further consideration. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)

## DISPOSITION

The summary judgment is affirmed.

_____
Márquez, J.

WE CONCUR:


_____
Bamattre-Manoukian, Acting P. J.


_____
Grover, J.